[Civ. No. 8431.   Third Dist.   Oct. 27, 1954.]

JOSEPH KEJR, Respondent, v. CONSTRUCTION
ENGINEERS, INC. (a Corporation), Appellant.

Guthrie, Darling & Shattuck for Appellant.

Preston, Falk & Johnson and Oscar Ostrum for Respondent.

PEEK, J.—This is an appeal by defendant from a judgment in favor of plaintiff quieting his title to certain real property and from the order denying its motion for a new trial.

On February 6, 1950, plaintiff Kejr, a resident of Colorado, entered into an agreement in writing with the defendant, a California corporation, whereby plaintiff agreed to sell and defendant agreed to buy certain timber. The execution of the contract followed a trip by Kejr to the home of Arthur C. Wright, president of defendant corporation, in Los Angeles, in the company of one Barker with whom Wright had had previous business dealings and one Hook, an employee of Wright. Barker presently had an agreement to procure timber for defendant to enable it to carry on its home building operations.

The contract incorporated by reference certain provisions of the Barker-Construction Engineers contract. One of the clauses so adopted provided as follows:

"13. Commencing on/or before July 1, 1950, purchaser will commence logging or milling operations from the lands conveyed by this agreement and will thereafter continue such operations, except when prevented from doing so by as a result of strikes, lockouts, interference by civil or military authorities, fires, other acts of God, or other acts beyond the control of purchasers, or market conditions which in the judgment of purchasers do not justify the continuance of such operations provided that in the latter case, operations shall be recommenced when in the judgment of purchasers, market conditions again justify such operations. When in full operation, it is contemplated that an average of 100,000 feet shall be logged per working day, but such production is not required hereunder."

The last sentence of said paragraph was amended to read 10,000 instead of 100,000 as set forth therein. Also included by reference were provisions that defendant would pay $3.00 per thousand feet for all timber cut, would pay the property taxes which were then delinquent, and in the event it carried on no operations for a month, it would report such fact to plaintiff on or before the 16th of the following month.

Kejr testified that at the outset of their negotiations Wright and Hook discussed the possible purchase by defendant of certain timber lands and lumber mills. Wright agreed to purchase one of the mills. The other proposals were either turned down or put over for further study. Barker then turned the talk to a discussion of what is referred to as the "Andersonia" tract which apparently involved an attempt by Barker to gain control of a corporation owning certain timber and a mill. He informed Wright that he desired Kejr to be cut in on his portion of that deal. Kejr believed his interest would be a sizable amount. It was then suggested by Barker that plaintiff sell his property known as the Manchester tract to Wright. Plaintiff replied that he had an offer of $100,000 cash for what he believed to be approximately 36,000,000 feet of timber. Wright admittedly knew nothing of the property but offered $2.50 per thousand. Barker insisted that plaintiff's estimate of the amount of timber was low; that there was at least 50,000,000 feet and that if plaintiff would sell for $3.00 per thousand he would receive more than $100,000 and additionally his taxes would be less. Wright subsequently agreed to the price, and Barker commenced to type out a contract. It was suggested by Wright and Barker that since their contract had been drafted by attorneys and was legally valid, portions thereof could be incorporated by reference into the Kejr contract. As executed the contract merely set out a description of the land and then incorporated by reference some 17 paragraphs from the Barker contract. And as previously noted the price per thousand was raised and the amount of the minimum daily cut was reduced.

The reason given by defendant for this reduction, according to Kejr, was to give defendant approximately 30 to 60 days to get a mill set up and to begin operations. It was further stated that they would soon be cutting at least 50,000 feet which was the minimum requirement for defendant to maintain its building schedule of two houses per day. Kejr further testified that when he mentioned the length of time it would take to log the property at only 10,000 feet per day, he was informed that they expected to clear the entire tract in two to four years.

Kejr insisted he never saw the Barker contract; that the paragraphs thereof were not read nor discussed separately; and that he never received a copy as he was told he would. This testimony was denied by defendant.

It is not denied that prior to July 1, 1950, no operations were commenced. The same is likewise true for the remaining months of that year, for all of 1951 and for 1952 up to August of that year, somewhat more than a month prior to the date set for the trial of the action, and nearly a year and a half after the action was filed.

In answer to the evidence introduced by plaintiff, defendant refers to Wright's discussions with Kejr both at his home in Colorado and in this state, at which Wright attempted to settle their differences, and to Wright's testimony that numerous letters had been written by him to Kejr and by his attorneys to those representing Kejr to the same effect; that defendant's difficulties were caused by misplaced faith in Barker who was subsequently convicted of a crime; that Barker had used the money given him for the payment of taxes for his own purposes; that Wright had endeavored to get a mill in operation; that it was economically impossible to do so; that he could have done so except for the Barker contract; and that he was unsuccessful in getting anyone else to put in a mill.

This latter testimony by Wright was contradicted by one Noble, a witness called by plaintiff. Noble testified that he was a sawmill operator and that several mills were operating in the area during the time here in question. Wright, to a degree, confirmed Noble's testimony, when on cross-examination he admitted that during part of this period the Caspar mill, having 80,000 feet or more capacity, was in operation. He further testified that he was not interested in logging the property if he could get the lumber elsewhere and that he had investigated the possibility of selling logs or the timber to other mills. However, in one of his letters to Kejr dated March 22, 1951, he stated that as soon as defendant could get its Willits remanufacturing plant in operation, he hoped to harvest plaintiff's timber and bring it to Willits.

Following submission of the case the trial court found that defendant, for the sole purpose of inducing plaintiff to enter into the "Memorandum of Agreement," through its officers and agent falsely and fraudulently with the intent to deceive and without any intention of performing the same, represented to plaintiff that defendant would commence the removal of timber on or before July 1, 1950, and continuously thereafter carry on logging operations in accordance with the terms of the agreement, and that plaintiff was deceived

by such representations and believing and relying thereon did execute the agreement. The court further found that plaintiff had not been unjustly enriched by defendant's breach; and that time was of the essence of the contract.

The substance of defendant's contentions is that the evidence is insufficient to support the findings of the court, and that the court abused its discretion in denying its motion for a new trial.

It is clear that the trial court primarily predicated its decision upon its finding that the defendant entered the agreement with no intention of performing the provisions thereof. Civil Code, section 1572, provides in part that, "Actual fraud . . . consists in . . . a promise made without any intention of performing it . . ." ■ In an action predicated on this ground the essence of the fraud is the existence of an intent at the time of the promise not to perform it, and such intent is always a question of fact.

■ " 'The intention not to perform a promise is a matter of inference from the facts proven and subsequent conduct may be sufficient to show such intention . . . Without the consideration of other evidence, the *subsequent failure to perform* warrants the inference that appellants *did not intend to perform* when they promised' . . . 'The making of a promise without intent to perform it constitutes fraud . . . and in such a case, the proof of a single fraudulent representation is sufficient to support the judgment, and without the consideration of other evidence, the *subsequent failure to perform* warrants the inference that appellants did not intend to perform when they promised.' [Citing cases.] (Emphasis added.)" (*Longway* v. *Newbery*, 13 Cal.2d 603, 611 [91 P.2d 110]; see also *Benson* v. *Hamilton*, 126 Cal.App. 331, 334 [14 P.2d 876].)

■ Here by contract defendant bound itself to "commence logging or milling operations" on or before July 1, 1950, and to "thereafter continue such operations" unless prevented by the various conditions set forth in the agreement. Furthermore the record shows without contradiction that defendant was wholly unfamiliar with the property, did not know where it was located, did not cruise it and had no equipment of its own with which it could perform its obligations. It was true Wright's son owned two trucks and that an affiliated corporation owned a mill then located in Oregon, but the fact remains that no actual logging or milling operations were commenced on or before the date specified

in the contract, or in fact until more than a year after suit was filed and just before trial of the action. Nor did defendant comply with the requirement relative to monthly reports to plaintiff.

In light of the rule enunciated in the Longway case, this court cannot say that the facts and circumstances surrounding the inception of the contract, together with defendant's subsequent failure to perform at any time prior to the time suit was filed, were insufficient to sustain an inference that defendant did not intend to perform.

By reason of what we have heretofore said, it becomes unnecessary to discuss the remaining contentions raised by defendant, since the record amply sustains the finding of fraud upon which the judgment may rest, and therefore the remaining findings which appellant so severely criticizes may be disregarded. Furthermore, defendant's offer "to do equity" was likewise immaterial, since the finding of fraud in the procurement of the contract resulted in an avoidance of the entire agreement rather than a forfeiture of the rights thereunder.

Defendant's final contention is that a new trial should have been granted on the grounds of surprise and newly discovered evidence by reason of plaintiff's rejection of defendant's tender at the time of trial of a check representing the amount of timber cut to that time. Considering the evidence as a whole, particularly the fact that defendant's operations were not begun until after suit was filed and the check was not presented until but a few days before the date of trial, it cannot be said that respondent's failure to sooner notify defendant of his intention to reject such tender would have created such a situation as would warrant a retrial. Therefore we cannot say that the action of the trial court in denying defendant's motion was such a manifest abuse of discretion as would warrant a reversal by this court.

The judgment and order are affirmed.

Van Dyke, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied November 23, 1954, and appellant's petition for a hearing by the Supreme Court was denied December 22, 1954.